roles.

And here is what I mean. So there is a time right before the knock on the door where officers had been sort of gathered in the hallway. Some people are on walkie-talkies. Some people are just sort of waiting for instruction. But before Officer Daering knocks on the door, two of those officers step out into the main doorway and keep that main doorway to the building open. I can imagine that's safety. I can imagine that's potentially not to have a number of officers visible through the peephole when an officer knocks on the door. But all of that is to say these certainly appear to be experienced law enforcement officers going into a situation that they had experience in dealing with in the past.

Why does that matter? Well, there has been a lot made about whether officers had the opportunity to get a warrant. And here is why I think the day and time matters. Because as I was reviewing the written documents, as I've been hearing the testimony, as I looked at the electronic evidence, I, too, was like why didn't anybody just get a warrant? And the actual answer -- the answer that I imagine, whether it's true or not, is I know what a Friday afternoon around the courthouse looks like. And I can imagine that if I'm an investigator with a major lead in a case, just knowing that you are going to write a warrant and have it urgently looked at by myself or one of my colleagues, could be a crapshoot. I work

until 5 o'clock on Fridays. I know most judges don't. And I know the process for getting a warrant signed. So submitting a document to an email account. Again, some people on their duty judge day are really good at responding to those, and some people aren't.

And so acknowledging the urgency of the investigative situation, my guess -- and that's all I'm going to call it, because I certainly have never worked in law enforcement and don't presume to know the ins and outs of that. But my reasonable guess is that on a Friday afternoon, hearing this information, perhaps they thought, "I don't know that I'm going to get that warrant right now, and we want to check this out. We want to bust this guy with drugs if they are in his house." And so they made the decision to go over and do a knock and talk, which they have the ability to do. The law has made very clear that knock and talks are not prohibited.

This Court is finding that certainly the officers as they were present, however many there were, were not utilizing their presence in the building or in the hallway or in the, if you will, curtilage, of this door to further their investigation. They were merely there as they gathered and got set to do the knock and talk. So they were in an area that they were lawfully able to be in, and they were doing a thing that they have the lawful ability to do: make contact with a citizen even if they had the pretext in their mind that heck

67

Case 2:25-cv-00140-BHL    Filed 03/04/26    Page 2 of 11    Document 23-1

yeah, they wanted to get in that apartment.

So the ultimate question for the Court is whether there was a reasonable basis to get into that apartment. The contact here has been gone through by the parties, and we did see that on the electronic evidence here today. So Officer Daering knocks on the door. There is an immediate response from within, a call out that says, "Who is it?" And the officer says, "Milwaukee police." And I think the person says, "Who?" again. And then the officer says again, "Milwaukee police." So the door opens a crack. There is this conversation looking for Marques Harris. The person is responding there is no Marques here. So this interaction is quite short.

But what also is important for the Court to note, especially as I reference the case law in a second, is that in this conversation we can hear the -- what they're talking about. But what we don't hear is anything in the background consistent with movement inside the apartment. We're not hearing -- you don't hear banging around. You don't hear footsteps. You don't hear flushing. You don't hear a sink running. You don't hear anything that gives you immediate information that there is even probably somebody else in this apartment. It's quiet.

And so the conversation continues and when the officer pushes the door open -- I'm first going to say, the

door is open such a crack, I don't know if anybody would have been able to tell for sure who was behind that door. It's Mr. Harris's apartment. It's a fair assumption that he is the one opening the door. I don't know if you could see that that was him. But, ultimately, the officers did use their hand to push the door open, and as soon as they push the door open, I think they could see that there was a second person in the apartment right by that kitchen area. The kitchen area being attached to the living room area. The door was in the living room area.

So now they're alerted to the fact of the presence of another person. Mr. Harris is, I'll use the word "guided" into the hallway. He is not resistant to that in any way. And in terms of the interaction with Mr. Harris in the hall, this Court has no concerns about how he was treated by officers. He was not free to leave. He was put on those stairs. But -- sorry -- Detective Stachula was the one who was primarily interacting with Mr. Harris, and those two men were conversing. And I'll talk more about the details of that conversation later. But I'm putting that aside for the moment because for purposes of the initial contact and the protective sweep, I don't have concerns about the way that that happened.

So now some of the police officers go into the apartment. They're telling the second person in the apartment not to move. He is complying. And similarly to standing

outside the door, you -- you don't hear any additional movement. There is no other obvious signs that there is someone in the apartment.

And so that's -- that's one of the things that I want to talk about because the case that I want to highlight for the parties is *State v. Robinson*. That's a Wisconsin Supreme Court case. The citation is 2010 WI 80. And this is a case that discusses a circumstance where officers went to do a knock and talk in a drug case. There is some dispute as to whether the person had an outstanding warrant or commitment order for citations. But, ultimately, the analysis includes whether officers could go into the apartment for exigent circumstances. And so it talks about the specific facts, of course.

Paragraph 7, officers were let into the building by another resident. They knocked on the door. They knocked on the door several times with no answer. They knocked again. They heard movement that led them to believe someone was inside. They had a phone number for the target of their -- of their investigation. They called that number and they could hear on the other side of the door that the phone rang. And so they now believe that this person is inside. They knock again. A person responds. And as soon as they identify themselves as police, they hear footsteps running from the door.

So, ultimately, in that case the Court found that there was an exigent circumstance because there were specific

identifiable facts that gave the police on scene reason to believe that someone might be fleeing or someone might be destroying evidence. And that is absent in this particular case.

The Robinson case says that the standard for exigent circumstances -- by the way, in the Robinson case, it's also quite ironic because paragraph 9, it talks about how they see loose marijuana on a coffee table when they go into the living room. Just an ironic overlap of facts that we have heard about in both of these cases.

So the standard, of course, "Exigent circumstances is a well-recognized exception to the warrant requirement." I'm in paragraph 24. "The exception recognizes that in special circumstances, when there is an urgent need coupled with insufficient time to obtain a warrant, it would be unrealistic and contrary to public policy to bar law enforcement officials at the doorstep. In such instances, an individual's substantial right to privacy in his or her home must give way to the compelling public interest in effective law enforcement. The government bears the burden of showing that the warrantless entry was both supported by probable cause and justified by exigent circumstances."

As I read this, I kept thinking to myself, again, why didn't we just get a warrant? Because I'm telling you under the record that was made here today, if all of that would have

71

been in an affidavit, I would have signed that warrant as soon as I had it. It certainly seems to me that there was probable cause to search that home if a warrant had been applied for. And so I don't have concerns about that on the record that's been made here. It remains the exigent circumstance part.

Paragraph 30 continues on with the definition of the exigent circumstance requirement. "We must determine whether police officers, under the circumstances known to them at the time, reasonably believed that a delay in procuring a warrant would gravely endanger safety, risk the destruction of evidence, or enhance the likelihood that the suspect will escape."

The Court goes on in paragraph 32 to say that "officers cannot benefit from exigent circumstances that they create, however, knocking on a door is not creating exigent circumstances."

And so this Court is finding that the officers did make a lawful contact with Mr. Harris, that once they did so, they do have some ability to ensure officer safety. The circumstances of opening the door, for example, and now seeing that there is a second person means that the officers have some ability to ensure that nobody is going to move or reach for anything. So that is when at least one other officer, if not two, entered past Officer Daering, and they immediately approached the second person. So they are in the apartment.

At this point, they're in the apartment.

The problem that I have with the additional searching of the apartment for this protective sweep is, first of all, there has been no factual basis that there was any reason apart from the general understanding of drug investigations and the potential risk that they have. There was no specific facts as to this apartment or why there was a concern about going deeper into this apartment. And more than that, the concern that I have is that once officers did go behind the curtain that's referenced into the back bedroom area or where the bathroom is or a closet is, I disagree with the characterization that they only looked in areas that are large enough for a person.

I was able to see with my own eyes that, as Attorney Batt pointed out, there was a touching of the bedding. There is a point at the end of the clip we saw in court here today where they're looking behind the T.V. There is another point in the clip we saw today where a different officer is looking in a linen closet. A linen closet that -- again, not a walk-in linen closet. Just a regular linen closet.

And there were other parts that I was able to see in preparing for the hearing that we didn't see in court here today, including that once they have the other person in the apartment -- who I believe is Mr. Harris's brother -- sitting on the couch, well, now we've got people who are going to guard him, like, freeze the scene. And the officers in the apartment

just happened to want to guard him and stand, like, right at the cusp of the kitchen where they just happened to want to search around a little bit with their eyes or walk and look down the counter and to do so without touching anything or moving anything. But there clearly was a desire to get in the apartment and see what they could find.

If that's the totality of the record here, this Court would find that there was -- that there -- that the scope of the exigent circumstances or the protective sweep was exceeded, and I would suppress this evidence.

But that's not the end of the record, because simultaneous to all that happening, Detective Stachula is out in the hall talking to Mr. Harris. And as I said before, the conversation that they're having is reasonable. It is not heated. It is a dialogue, which is to say that it's not Detective Stachula just berating or giving a whole bunch of information that might be overwhelming. These two are talking, and Mr. Harris becomes emotional. He wants to know what's going to happen. He wants to know if he's being arrested. He wants to know more about the evidence. And the detective is skilled in being able to give the information that is necessary and helpful and truthful enough to try and persuade Mr. Harris to comply.

I don't find that Detective Stachula ever lied to Mr. Harris. He told him it's not -- it's not a sure thing that

74

[handwritten top margin: drug trafficking is insufficient, on its own, to demonstrate a danger to officers]

1  you have to be arrested today.  He talked about that being a
2  decision that he would have to make.  He talked about what
3  would happen if a warrant had to be applied for.  He didn't lie
4  about that process.  Now that they're there, if they applied
5  for a warrant, Mr. Harris might have gone into custody and had
6  to wait for that.  It might have taken several hours.  So there
7  was nothing about that conversation that was inappropriate.
8  And, ultimately, Mr. Harris wanted to do whatever he could to
9  help his situation.  He verbally consented to the search of his
10  apartment. [handwritten: Without the unlawful intrusion into the [apartment?], the police would not have had any justification to [search?] the apartment without a warrant]
11       They brought him back in the living room and sat him
12  in a chair.  He is right there with his brother sitting across
13  from him.  By that time I think they had mom on the phone.
14  They asked him again if he would consent to the search, and
15  they offered him the consent to search form, and he signed that
16  form.  He signed that form while he was crying.
17       There is nothing about that decision that I think was
18  easy.  I also don't think he was compelled to give consent.
19  The totality of circumstances here ultimately resulted in law
20  enforcement obtaining consent to search.  And so anything that
21  was obtained as a result of this search, understanding that
22  we're not talking about items that were specifically identified
23  and located and confiscated through the protective sweep, but
24  anything that was in that apartment was going to be found on
25  the basis of that consent search even though they had already

[handwritten right margin: protective sweep]

[handwritten bottom margin: The state fails to point [to] articulable facts that there was a threat within the defendant's home nor [illegible]]

protective sweep.³ Even before officers initiated the "knock and talk," they had information that would lead reasonable officers to fear for their safety during the interaction with Harris. Detective Stachula, who had been investigating Harris and his associates in the drug trafficking ring, knew that Harris had a prior felony gun charge. (R. 109:8–13.) Detective Stachula also knew that Jones had given Harris his drug phone and drugs. (R. 72:18–21.) As Detective Stachula and other officers approached the apartment, they heard what sounded like multiple voices coming from Harris' apartment. (R. 109:29.)

When Harris opened his door only a crack, Officer Daering identified him by his photograph and pushed the door open to see Harris' brother standing in the kitchen. (R. 109:31–32, 41; 98 Ex. 2 3:40–3:50.) Two officers immediately entered Harris' apartment to do a protective sweep to ensure officer safety and prevent the destruction of evidence. (R. 109:32–33.)

Harris argues that officers acted unlawfully during the "knock and talk" when they entered his apartment to conduct a protective sweep. (Harris' Br. 17–29.) Harris focuses his argument on the absence of any "exigent circumstances" or probable cause warranting the officers' entry and search of his apartment. (Harris' Br. 19–23.)

As an initial matter, Harris' arguments regarding the need for exigent circumstances or probable cause miss the mark because a distinct legal doctrine allows officers to perform a limited protective sweep when circumstances

---

³ The State does not dispute that the officers exceeded the scope of the protective sweep by searching areas of the apartment that were too small for a person to be hiding. However, for the reasons stated below, the circuit court properly denied Harris' suppression motion because he later voluntarily consented to a search of his apartment.